[Crim. No. 5924. Second Dist., Div. One. Nov. 26, 1957.]

THE PEOPLE, Respondent, v. FRANK AMBROSE, Appellant.

*Assigned by Chairman of Judicial Council.

514

Samuel C. McMorris for Appellant.

Edmund G. Brown, Attorney General, and Herschel T. Elkins, Deputy Attorney General, for Respondent.

WHITE, P. J.—In an information filed by the district attorney of Los Angeles County, defendant was accused in four counts of the crime of burglary. Prior convictions of attempted burglary and burglary, both felonies, committed in the State of New York and for which defendant served terms of imprisonment, were alleged.

Defendant pleaded not guilty as to each count of the information and denied the prior convictions. Trial by jury was

duly waived and it was stipulated that "the case for the People in chief be submitted to the court on the transcript of the evidence taken at the preliminary hearing . . . Thereafter, . . . either side may present further evidence, including the express right of the defendant to cross-examine all officers not only on the basis of their testimony given or for the proceedings here but, counsel, we would stipulate he may use the transcript of the preliminary hearing not only in the case which has resulted in this case being before the Court but also that previous preliminary transcript." The prosecution reserved "all rights as to objections to testimony given in the transcript." Evidence in addition to that given at the preliminary examination was introduced. Defendant was adjudged guilty of burglary as charged in each count, which the court found to be burglary of the second degree. The prior convictions were found to be true. Defendant's motion for a new trial was denied, and he was sentenced to state prison. From the judgment of conviction and from the order denying his motion for a new trial, defendant prosecutes this appeal.

Count I charged burglary of the residence of Shelton Riley and Arthur F. Walker, at 1228 W. 65th Place, Los Angeles, on May 19, 1956. A decanter, $18, a gold watch (People's Exhibit 1), and four bow ties were stolen.

Count II alleged that on September 14, 1956 defendant burglarized the residence of Mrs. Irene Harrington, 2207 W. 73rd Street, Los Angeles, resulting in the theft of a Bolsey camera (People's Exhibit 2), a case and a flashlight.

Count III accused defendant of burglarizing the residence of Mr. and Mrs. Garcia, 1358 W. 70th Street, Los Angeles, between the dates of September 20 and 22, 1956, in which two watches and some money from a piggy bank were stolen.

Count IV charged that on July 15, 1956, defendant burglariously entered the residence of Edith Nelson, 9606 LaSalle, Los Angeles, and stole therefrom a movie camera, an index box, a carton and a half of cigarettes, and a ring (which was onyx with a small diamond—People's Exhibit 4).

Concerning the factual background surrounding this prosecution the record reveals that about 8:05 p. m. on the evening of September 27, 1956, Police Officer Neal, accompanied by Officer King, was driving a police automobile on 69th Street in the city of Los Angeles when Officer King saw defendant walking on the sidewalk. The latter's jacket pockets were "bulging and a flash-light and a pair of gloves sticking

out of his right jacket pocket." Officer King pulled over to the curb and said, "Police officers." Defendant continued to walk. The two officers got out of the automobile and Officer King called out, "Police officers, stop." After Officer King had repeated this phrase about three times defendant halted. The officer asked him for identification. Defendant stated he had none. The officers inquired as to where defendant lived. In the police report (introduced as People's Exhibit 6), it is stated that the defendant gave 1569 W. 69th Street as his address. He stated that he worked in a garage and that he was going to visit a friend named Finnerty.

Officer King arrested the defendant and searched him, finding on his person a screw driver and two brown paper bags. The officers asked defendant to be seated in the rear of the police vehicle, at which time he fled. He was apprehended and taken to the police station. When they arrived at the police station, Officer King observed that defendant was not wearing two rings which the officer had observed on him at the time of his arrest. The two rings (People's Exhibit 4), and a little gold ring, were found by the officer near the rear door of the police vehicle. Officer King asked defendant what he had done with the rings and the latter answered that he had thrown them out of the police car.

On October 2d, Officer Hausman, a Los Angeles police officer, and Officer McGinty went to the Olive Hotel at 750 South Olive. Room Number 5 in this hotel was registered to the defendant. The room was registered in only one name. The officers asked the hotel manager, Harry Hartsook, for authority to enter the room. Mr. Hartsook opened the door and let them in. After this first visit, Officer Hausman went to the jail, picked up defendant, and took him out to the hotel. This second visit to the hotel was a "matter of hours" after the first visit.

Officer Hausman, in the presence of defendant, opened the door. When they had entered the apartment, Officer Hausman and defendant had a conversation. The officer said, "Look, there is a lot of stuff here. Now, you tell us which is stolen and which is not, and we will put the stolen stuff in one pile and it will save us a lot of trouble." The defendant said, "All right." The officers then followed this procedure: One would pick up an object and say to the defendant, "Is this stolen?" To some of these queries, defendant would say, "Yes," and to others he would say, "No." Two watches

(People's Exhibits 1 and 3) and a camera (People's Exhibit 2) were identified by the defendant as being stolen property.

The following day, October 3d, Officer Hausman and defendant drove to various addresses.

They went to 1228 West 65th Place. (Count I.) In response to Officer Hausman's question as to whether he recalled that place, defendant said, "Yes, I went through the back door. I got some liquor and some— and bow ties from that place."

They drove to 2207 West 73rd Street. (Count II.) In response to Officer Hausman's inquiry as to whether defendant remembered that house, the latter said, "I went in there through a window. I think I got a camera there."

They proceeded to 1358 West 70th Street (Count III) and when asked if he recalled that location, defendant replied, "Yes, I went in the front window. I got some change and a watch that was shaped like a horseshoe."

These statements of defendant were made freely and voluntarily and without any threats or promises of any sort.

At the 77th Street Jail, Officer Hausman asked defendant, "Where did you get the black ring that had the white setting in it, . . . that was found on your person at such time as you were arrested?" The defendant said he took it from a house, not "too far in the past," but he didn't recall which house it was.

Following a preliminary examination on October 10, 1956, defendant was discharged. A second complaint was obtained and after preliminary examination he was held to answer and the instant trial ensued.

As a witness in his own behalf defendant testified that he was walking on 69th Street at about 8 p. m. on September 27, 1956. He had a flashlight, gloves and a screw driver in a paper bag which he was carrying. He saw lights directed towards him and heard someone say something, but he paid no attention to the sound. An officer then arrested him and asked where he worked, what he was doing in the neighborhood and if he had any identification. He told the officer that he had no address, that he was a transient, and that a friend of his lived in the neighborhood. He was questioned again but refused to say anything more. Officer King then kicked him and he ran. That night he did have some rings on his fingers, but in the police car, he took them off and, at the request of police officers, handed them to the officers.

At a later date, he, in company with police officers, went to 750 South Olive. Upon arriving, an officer asked a clerk

for the key to Room 5. The clerk said he could not give him the key but that he would summon the manager. The manager gave to the officer a pass key to the room. Room 5 was his room; he was registered under the name of Fontaine. Officer Hausman and Officers King and Neal walked with defendant to Room 5. Officer Hausman opened the door with the key and told him to enter. Defendant further testified that at no time did he give his consent for the officers to enter his room, nor did he authorize the hotel manager or anyone else to permit the officers or any other person to enter his room.

As his first ground for reversal appellant urges that the court erred in its rulings on the admission and exclusion of proffered evidence in that it,

"a. Sustained objections to impeachment questions;

"b. Sustained objections to the introduction of a transcript;

"c. Erred in admitting an exhibit."

In this regard appellant asserts that Officer King testified that the former started to run when requested to go to the police station for investigation. On cross-examination appellant inquired of the officer as to whether he had testified at the first preliminary examination and on receiving an affirmative reply, appellant's counsel asked, "And at that time you did not mention anything about running, did you?" Objection was made on the ground of immateriality "unless there was a showing there was a question asked to which there was a negative response." The objection was sustained. Then the following question was propounded:

"By Mr. Graves (appellant's counsel) : Was the statement you made in the police report in fact true, officer? A. Yes.

"Q. Then your statement in court is in fact false?

"THE COURT: Now you are asking the officer to take over my job. I am the one to determine the truth or falsity of any evidence."

The rulings were correct. ■ While a witness may be impeached by evidence that at other times he has made statements inconsistent with his present testimony (Code Civ. Proc., § 2052), the statements allegedly made must be related to him and he must be asked whether he made such statements, and if so, he must be allowed to explain them. ■ A witness may not be impeached by showing that he omitted a fact or stated it less fully at a prior proceeding unless his attention was called to it at that time and he was then

asked to testify concerning the very facts embraced in the questions propounded at the trial (*People* v. *Reimringer*, 116 Cal.App.2d 332, 342 [253 P.2d 756]; *People* v. *Casanova*, 54 Cal.App. 439, 446, 447 [202 P. 45]; *People* v. *Maddux*, 102 Cal.App. 169, 171-172 [282 P. 996]). Appellant did not follow such procedure.

As to the question regarding the police report the record reflects that appellant's counsel read it and inquired of the police officer whether he had written it. The answer was in the affirmative. Subsequently, the officer was questioned as above set forth as to whether his testimony at the trial was, "in fact, false." ■ Where, as here, the trial was had before the judge sitting without a jury, he is the trier of fact and it was for him to determine whether the testimony was false or not. (*Thompson* v. *City of Long Beach*, 41 Cal.2d 235, 246 [259 P.2d 649]; *Dillard* v. *McKnight*, 34 Cal.2d 209, 223 [209 P.2d 387, 11 A.L.R.2d 835].)

Appellant next complains that the court erroneously admitted into evidence an exhibit as appellant's, although it was not offered by him. The record reveals that appellant offered as defendant's Exhibit "A" for identification a "case envelope" containing an account of statements made by him to the officer. Appellant now complains that it was improper for the prosecution to offer the envelope and contents in evidence as an exhibit for the People. Appellant's contention lacks substance here because the record shows that the court sustained appellant's objection to the introduction into evidence of the foregoing "case envelope."

Appellant attempted to introduce into evidence a transcript of the first preliminary examination wherein the case was dismissed. An objection by the prosecutor that it was "incompetent, irrelevant and immaterial, and not tending to prove or disprove any issue in this case, and it is not proper impeachment," was sustained.

■ Appellant argues that, "The parties having stipulated that the testimony as contained in the transcript of the first preliminary hearing, which resulted in dismissal of the information, might be used in cross-examination, it was misconduct on the part of the prosecuting attorney to oppose its use after it became apparent that obvious inconsistencies were shown thereby in the People's case." The record clearly shows that it was stipulated that the transcript of both the first preliminary examination as well as the second one might be "used" for impeachment purposes on

cross-examination of the People's witnesses, but there was no stipulation that the transcript or either of them might be introduced into evidence. No showing is made that the transcript of the so-called first preliminary examination would shed any light on the issues before the court nor that the persons who testified at such preliminary hearing were not available. Since no proper foundation was laid for admission of the transcript, the ruling of the court was proper.

It is next urged by appellant that the court erred in overruling objections to the introduction of the exhibits allegedly obtained by unlawful search and seizure, in that it allowed in evidence:

"a. A ring obtained from the appellant's person after an unlawful arrest;

"b. Two watches and a camera obtained from the appellant's room as a result of an unlawful search."

Appellant argues that the ring mentioned in Count IV of the information was discovered as a result of the search of his person as an incident to his arrest. Conceding that a search may be made incidentally to a valid arrest, appellant however challenges the legality of his arrest in the instant case.

Section 836, subdivision 5, of the Penal Code authorizes an arrest by a peace officer, at night, when there is reasonable cause to believe "that (a person) has committed a felony." ▉▉ As was said by this court in *People* v. *Jaurequi,* 142 Cal.App.2d 555, 559 [298 P.2d 896], "It is settled that reasonable cause to justify an arrest is not necessarily limited to evidence which would be admissible at the trial on the issue of guilt (citing cases). 'The term, reasonable or probable cause, has been defined: "By 'reasonable or probable cause' is meant such a state of facts as would lead a man of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion, that the person accused is guilty." (*In re McCarty,* 140 Cal.App. 473, 474 [35 P.2d 568].)

" 'The term, probable, has been defined as meaning "having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt." (Citing cases.).' "

In determining what constitutes reasonableness each case must be reviewed in the light of its own facts (*Go-Bart Importing Co.* v. *United States,* 282 U.S. 344, 357 [51 S.Ct. 153, 75 L.Ed. 374]). As to the officers accosting appellant,

it has been held that an officer may question people who are outdoors late at night (*People* v. *Simon,* 45 Cal.2d 645, 650 [290 P.2d 531]). With the foregoing rules before us, we have no hesitancy in saying that the officers were reasonably justified in arresting appellant. ■ At about 8 p. m. the officers observed him walking along 69th Street. There had been frequent early evening burglaries in this neighborhood. Protruding from appellant's jacket pocket was a flashlight and a pair of pigskin gloves. Leaving their vehicle, one of the officers called out three times, ''Police officers, stop.'' before appellant complied. The officer asked him for identification and he responded that he had none. Asked where he lived, appellant gave as his address 1569 W. 69th Street, Los Angeles (a nonexistent address). Thereupon Officer King arrested appellant, searched him and found on his person a screw driver and two brown paper bags. Appellant was placed in the police vehicle at which time he fled, was overtaken and then transported to the police station. We entertain no doubt that knowing of recent burglaries in the neighborhood they were justified in concluding that a person carrying a flashlight and a pair of pigskin gloves was a suspicious person and they were entitled to question such person. Indeed, from the foregoing facts before the officers, coupled with the inferences reasonably to be drawn therefrom, there can be no doubt as to the reasonableness, but also as to the necessity for arrest (*Gisske* v. *Sanders,* 9 Cal.App. 13, 16, 17 [98 P. 43]; *People* v. *West,* 144 Cal. App.2d 214, 219 [300 P.2d 729]; *People* v. *Jaurequi, supra,* p. 560).

■ Furthermore, the ring here in question was not obtained by any ''search.'' When they apprehended appellant, the officers observed he was wearing two rings. Upon arrival at the police station, Officer King noticed that appellant was not wearing the two rings. They were later found near the rear door of the police vehicle. Appellant stated he had thrown them out of the automobile and at the trial admitted he was wearing the ring mentioned in Count IV at the time of his arrest. Therefore, there was in fact no search or seizure as those terms are defined in the cases.

■ As was said in *People* v. *West, supra,* pages 219-220, ''. . . A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way. While it has been said that ordinarily searching is a function of

sight, it is generally held that the mere looking at that which is open to view is not a 'search.' "

Appellant next contends that the watches and camera introduced into evidence as People's Exhibits 1, 2 and 3 (mentioned in Counts I, II and III of the information) were procured by an illegal search of his hotel room. The testimony concerning the officers' two visits to appellant's room has heretofore been narrated and need not now be repeated. Suffice it to say that appellant contends that the manager of the hotel was without authority to admit the officers to appellant's room either on the occasion when he was not with them or on the occasion when he accompanied them. That therefore, both the entry of the officers and their consequent search of the room was in violation of appellant's constitutional rights. In the instant case the officers went to the hotel where Room 5 was registered to appellant under the name of ''Fontaine.'' The officers asked the hotel manager for authority to enter the room whereupon he opened the door and let them in. The question of consent is to be determined by the trier of fact (*People* v. *Smith*, 141 Cal. App.2d 399, 402 [296 P.2d 913]; *People* v. *Michael*, 45 Cal.2d 751, 753-754 [290 P.2d 852]; *People* v. *Lujan*, 141 Cal. App.2d 143, 147 [296 P.2d 93]). Upon the authority of *People* v. *Gorg*, 45 Cal.2d 776, 783 [291 P.2d 469], and *People* v. *Caritativo*, 46 Cal.2d 68, 73 [292 P.2d 513], we are persuaded that appellant's contention must be rejected. In the cited cases it is held that where the officers have acted in good faith with the consent of a homeowner or landlord in conducting a search, and the latter believed they had joint control over the premises, and the right to enter them, evidence so obtained cannot be excluded merely because the officers may have made a reasonable mistake as to the extent of the owner or landlord's authority. (See also *People* v. *Silva*, 140 Cal.App.2d 791, 794-795 [295 P.2d 942].)

In the case now engaging our attention, we therefore conclude that it was reasonable for the trier of facts to conclude that the hotel manager believed, as he testified at the trial, that he possessed the authority to give consent to the officers to enter appellant's room and that it was equally reasonable for the court to hold that the officers acted in good faith and with the belief that the manager possessed the authority asserted. Therefore, the objects found in appellant's room were admissible in evidence. (*People* v. *Burke*,

47 Cal.2d 45, 49 [301 P.2d 241]; *People* v. *Hood,* 149 Cal. App.2d 836, 838, 839 [309 P.2d 135].)

▮ Furthermore, the ring, watches and camera were not required to be introduced into evidence. Penal Code, section 459, defines burglary as the entrance into a house or apartment with intent to commit larceny. In each count of the information, the corpus delicti of the crime was proved with the testimony of the occupants of the respective premises burglarized. Appellant admitted the taking of some of the articles set forth in the respective counts. Having proved the corpus delicti and having the admissions of appellant that he burglarized the various premises and took certain of this missing property, there was no need for the introduction of the stolen property as exhibits.

Finally, appellant contends that certain admissions made by him were made as a result of an unlawful search and therefore, should not have been admitted in evidence. ▮ The generally accepted test adopted by state courts to decide whether a confession is admissible is whether under all existing circumstances it was freely and voluntarily made, without any inducement being held out to the declarant (*Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 921]).

In the case now under consideration, on the day following the search of appellant's hotel room, Officer Hausman drove appellant to the addresses involved in Counts I, II and III. At each of these premises appellant made admissions such as, "Yes, I went through the back door. I got some liquor and some—and bow ties from that place."; "I went in there through a window. I think I got a camera there."; and "Yes, I went in the front window. I got some change and a watch that was shaped like a horseshoe."

▮ It is now contended by appellant that he would not have made these statements had there been no search of his hotel room on the previous day. In support of his position appellant relies on the case of *People* v. *Dixon,* 46 Cal.2d 456, 458 [296 P.2d 557]. In that case, the police officers unlawfully searched the appellant's garage and found heroin. At the trial, the defendant testified that a Mrs. Lopez forced her to keep the heroin. In her statement, she revealed that she knowingly possessed the heroin. The court held that the testimony "was impelled by the erroneous admission of the illegally obtained evidence and cannot be segregated from that evidence to sustain the judgment." A mere reading of the cited case at once suggests many distinguishing features

and clearly shows that appellant was not confronted with such a dilemma as confronted the accused in the Dixon case. In the instant case appellant could have remained silent. He was not, as in the Dixon case, *supra*, obligated to make a statement. There is no contention that his statements were coerced, but on the contrary, there was positive testimony that they were free and voluntary. The prior search was but a factor to be considered as to the admissibility of the statements. Similar to so-called illegal detention cases, it is a factor in the consideration of whether the statement was voluntary (*Rogers* v. *Superior Court, supra,* p. 10).

There is a further and decisive reason why appellant's contention cannot be sustained, and that is our holding, as heretofore set forth, that it was reasonable for the trial court to rule that the search of appellant's room was lawful.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each is affirmed.

Fourt, J., and Drapeau, J.,* concurred.

A petition for a rehearing was denied December 19, 1957, and appellant's petition for a hearing by the Supreme Court was denied January 23, 1958. Carter, J., Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.

---

*Assigned by Chairman of Judicial Council.