[Crim. No. 2232.   Fourth Dist.   July 26, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. CARLOS ALVAREZ, Defendant and Appellant.

John Stanton, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Leslie F. Bell, Deputy Attorney General, for Plaintiff and Respondent.

CONLEY, J.*—The defendant, Carlos Alvarez, was convicted of burglary. He was granted probation subject to certain conditions, but has nevertheless appealed.

There is ample evidence to warrant his conviction. The burglarized place of business is a television and appliance repair shop in Oceanside conducted by Myron T. Coleman, Jr.; the building is a converted warehouse with a conventional front door and a rear overhead door. In his business, Mr. Coleman uses a white truck with the words "Coleman's Service" stenciled on it. On Saturday, September 19, 1964, he closed the shop at 12:15 p.m. and personally locked all the doors, leaving the truck parked in front of the store with the keys in a desk inside the building.

When Mr. Coleman and his son returned to the repair shop the next day between 11 and 11:30 a.m., they noticed that the security patrol card was not in its usual position in the door

_____

. *Assigned by the Chairman of the Judicial Council.

jamb but had fallen to the ground; this was indicative of the fact that someone had opened the door after the store had been closed. Mr. Coleman had given no one permission to enter the building between the closing time on Saturday and when it was opened on Sunday. The proprietor found that there were some articles missing, including four rings, a radio and 3 television sets, consisting of a charcoal grey Westinghouse, a brown set, and a new bright gold Magnavox with a handle on the top. The rings had been left in their boxes in a larger cardboard box when the shop was closed. The missing radio was a G.E. ''Cross-Country'' transistor model which he had received for repair on the previous day. Further investigation by Mr. Coleman revealed that a pair of greasy khaki-colored Marine-type overalls, which had been worn by one of the workmen in the shop, was missing.

The truck which had been left at the front of the store was gone also, and its keys were not where Coleman had left them when he closed the place of business on Saturday.

A neighbor called Mr. Coleman's attention to the fact that there were several cartons propped up against the side of the building within about 5 feet of a window which opened outward and which was wide enough to permit a man to crawl through it. Mr. Coleman did not see his truck again until September 21st when he visited the junk yard where it was impounded. It had been discovered by the police up a dirt road in a deserted part of the town.

One Elidia Najera, who lives in Oceanside with her brother-in-law and sister, the Fred Felans, testified that on the morning of September 20, 1964, at about 6 a.m., the defendant, Carlos Alvarez, knocked at the door of the residence. He was wearing Marine-style khaki coveralls which were greasy and dirty; he said he wanted to speak with Fred Felan and appellant was taken into their bedroom.

Enedina Felan, Fred's wife, testified that early that Sunday morning appellant came to her house and entered the bedroom shared by her and her husband. She recognized his voice but did not actually see him, as she was ''half-asleep.'' He asked if he might leave some articles in the garage, and she said, ''Yes.'' The Felans were well-acquainted with Alvarez and they had been with him and his wife on the night before, having driven into town in appellant's Cadillac car; they had stayed awhile in a bar and the Felans then returned in a taxi to their residence.

Later that Sunday morning, Mrs. Felan looked into her

garage before her husband had a chance to do so, and she then noticed some television sets covered by a blanket, which had not been in the garage the day before. Later, Mrs. Felan also discovered a transistor radio which was People's Exhibit 4, in a corner of the garage under a sea bag. She took it into the kitchen and telephoned the police. They took it from her and it was introduced into evidence at the trial. She also found a blue book under the sea bag which she gave to the police.

Her husband, Fred Felan, testified that Carlos Alvarez talked with him on Sunday, September 20th, around noon at his home. Before that time on that morning, Felan had been in his garage and he then noticed a transistor radio under a blanket, together with three television sets, and a TV repair book that had not been there before that date. Mr. Felan said he did not know how the television sets got there, but he recognized People's Exhibits 1 and 3 being similar to the sets he had seen in his garage on September 20th. He talked with appellant on the Sunday in question about the television sets, and the appellant stated that he got them from his boss and was going to repair them to be sold at a low price. On that same day in the evening, while Felan watched, appellant removed the television sets from the garage.

A police officer, Richard Green, talked with Mr. Coleman regarding the details set forth in the police crime report and spoke also with John Pike, a used car dealer, to whom he had been referred. Pike stated that a man had been in his lot on business on the 21st of September and had told him that a friend of his had left several television sets in his garage. The man had a black eye and worked at Camp Pendleton. Green contacted the Criminal Investigation Section at Camp Pendleton, which located Fred Felan as the man in question. Officer Green talked with Felan and learned that Carlos Alvarez had left the television units in Felan's garage and had removed them in his Cadillac on Sunday, September 20th. Green also spoke to Mrs. Felan and Elidia Najera at their home, and they told him what they knew about the television sets.

The police officer then found the address of appellant at the Oceanside post office, and went to his home at about 2 p.m. on the 23rd of September, intending to talk with him concerning the burglary. Upon arrival he went to the front door of the residence where he entered into conversation with

Mrs. Alvarez. He identified himself as a policeman and asked if her husband was at home. She answered that he was not there but was at his place of employment. Mrs. Alvarez asked Officer Green the reason he wished to see her husband, and he stated that it was with regard to the burglary of some television sets. She then said that her husband had given her one on the 21st of September. Green saw an operating television set from the doorway and asked if it was the one. When she said, "Yes," he noted that the machine fitted the description of one of the articles that had been stolen from Coleman's Service. With the consent and permission of Mrs. Alvarez, Green entered the home and while he was there he asked if he could take the set to headquarters for identification. Mrs. Alvarez gave an affirmative response, with the consequence that Green put the set in the patrol car. He then mentioned to Mrs. Alvarez that two television sets were still missing. She said that her husband had hidden the keys to their car, but she had found them and would check the car. She opened the trunk, and the missing Magnavox was there. Mr. Green asked Mrs. Alvarez' permission to take the Magnavox to police headquarters and Mrs. Alvarez agreed, without objection or argument. Officer Green took the two television units to the police department where they remained until they were used at the preliminary hearing and at the trial.

On September 23, 1964, Green talked with the appellant at the police station. He first informed him of his constitutional rights, that he did not have to make any statement, that he was entitled to the services of a lawyer, and that anything he said might be used against him. No threats were made or promises of reward. He asked the defendant whether there was anyone else who should be charged and the appellant said, "I'll take this myself. I have in the past."

On September 24th, appellant made a free and voluntary written statement in Green's presence. Although this writing had been lost at the time of the trial, the substance of the statement, as related by Green on the witness stand, was that on the Saturday evening in question the defendant was at the Felan residence, and that a Marine, who was also there, asked him if he could sell some television sets for him; appellant said that he told the Marine that he was a handyman, that he had had some prior experience in handling second-hand goods and that the sets would have to be repaired before being sold. He also stated that he had seen the sets at the Felan residence on that Saturday evening. It is clear that

the statement made by him was freely and voluntarily given after he had been informed of his constitutional rights.

Basing his contention upon the principles set forth in cases such as *People* v. *Haven,* 59 Cal.2d 713 [31 Cal.Rptr. 47, 381 P.2d 927] and *People* v. *Shelton,* 60 Cal.2d 740 [36 Cal.Rptr. 433, 388 P.2d 665], the appellant contends that the court erred in receiving evidence concerning the television sets which were removed from the defendant's home; in this connection he claims that Officer Green's entry was an unreasonable search and seizure, that there was no justification for his entry into the home in the absence of a search warrant and that the People did not meet the burden of proving a valid consent to enter the house. The contention is without merit.

It cannot be doubted that at the time he went to the defendant's house Officer Green had sufficient information to constitute reasonable and probable cause for believing that appellant had committed a felony; he had seen the burglary report which listed the television sets and the Marine-type coveralls; he knew of appellant's appearance at the Felan home, that he was dressed in the coveralls, and that he there requested permission to leave the television sets; he knew of the storage of the property by the defendant and the removal of the sets in the defendant's car by the appellant himself.

It was held in the case of *People* v. *Michael,* 45 Cal.2d 751, 754 [290 P.2d 852], that it is proper for a police officer to seek interviews with suspects or prime witnesses in a criminal investigation.

''Thus, it is not unreasonable for officers to seek interviews with suspects or witnesses or to call upon them at their homes for such purposes. Such inquiries, although courteously made and not accompanied with any assertion of a right to enter or search or secure answers, would permit the criminal to defeat his prosecution by voluntarily revealing all of the evidence against him and then contending that he acted only in response to an implied assertion of unlawful authority.''

When Officer Green arrived at the home and went to the front door he was met by the defendant's wife, who talked freely and voluntarily. She said that her husband was at work and then wanted to know why Officer Green wished to see him. When she was told that he wanted to ask about a burglary involving television sets, she volunteered that her

husband had given her a set within the last few days. This set was clearly visible through the doorway.

Officer Green had every right to talk to Mrs. Alvarez.
As is said in *People* v. *Carter*, 48 Cal.2d 737, 746 [312 P.2d 665] : ''When the husband is absent from the home, it is the wife who controls the premises, the ordinary household property, the family automobile, and with her husband's tacit consent determines who shall and who shall not enter the house on business or pleasure and what property they may take away with them. [Citation.] When the usual amicable relations exist between husband and wife [citations], and the property seized is of a kind over which the wife normally exercises as much control as the husband, it is reasonable to conclude that she is in a position to consent to a search and seizure of property in their home. If Mrs. Carter freely consented to the removal of defendant's property, there was no unreasonable search or seizure. [Citations.]''

And in *People* v. *Dominguez*, 144 Cal.App.2d 63, 65 [300 P.2d 194], it is said: ''It is usual for the wife in the home, while the husband is away, to determine whether visitors may enter the home. Here the wife gave her express permission. This eliminates all questions of fraud, force or trespass. [Citations.]''

Furthermore, it can scarcely be contended that a search was necessary or that the television set was in any sense hidden. *People* v. *West*, 144 Cal.App.2d 214, 219-220 [300 P.2d 729], holds that things that are open to view do not require a search. A search implies a prying into hidden places for something that is concealed, something that has been intentionally put out of the way. (See also *People* v. *Holloway*, 230 Cal.App.2d 834, 839 [41 Cal.Rptr. 325] ; *People* v. *Martin,* 45 Cal.2d 755, 762 [290 P.2d 855] ; *Mardis* v. *Superior Court*, 218 Cal.App.2d 70, 74 [32 Cal.Rptr. 263] ; *People* v. *Norton*, 209 Cal.App.2d 173, 176-177 [25 Cal.Rptr. 676].)

The officer did not conduct a search when he observed from outside the appellant's house through the open door one of the stolen television sets, nor did he ''seize'' the television set, which would presuppose a forceful dispossession. There was here a voluntary surrender and not a seizure. (*People* v. *West, supra,* 144 Cal.App.2d 214, 220; *People* v. *Reed,* 188 Cal.App.2d 395, 410 [10 Cal.Rptr. 536].) Inasmuch as the officer was justifiably at appellant's home, observed from outside of the home one of the stolen television

sets, and was invited into the house by appellant's wife where she freely consented to his removal of the set, there was no violative angle to what was done by the officer, and the mere fact that he did not have a search warrant is not an answer to the problem of the admission of the evidence. (*People* v. *Winston,* 46 Cal.2d 151, 163 [293 P.2d 40].)

As the taking of the television sets to police headquarters was accomplished under the factual conditions above described, there was no infringement of the defendant's constitutional rights.

It is pointed out by appellant that the officer, in part of his testimony at least, was not specific and certain with respect to the exact language used by Mrs. Alvarez in inviting him to enter the house. The trial court, however, took over the questioning of the officer with respect to this matter and it appears that there was sufficient evidence to justify the conclusion of the trier of fact that she gave permission to him to enter the home and to take the television sets to the police station. These were questions of fact, and we believe that the evidence supports the conclusion that the officer was not only asked into the house but was given express approval for the removal of the stolen television sets by Mrs. Alvarez.

The appellant further suggests that because the alleged search and seizure was not, as he contends, constitutionally justified, appellant's statement made on the 24th day of September was "a fruit of the poisonous tree" and, therefore, inadmissible. (*Silverthorne Lumber Co., Inc.* v. *United States,* 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319, 24 A.L.R. 1426]; *People* v. *Gale,* 46 Cal.2d 253 [294 P.2d 13].) This contention does not find support in the record. The statement made by the appellant was properly received in evidence as he had been previously advised of his constitutional rights. It was made by him voluntarily and without improper inducement or promise of reward. The removal of the television sets was with the consent and approval of Mrs. Alvarez and was entirely proper. There can be no valid objection to the receipt in evidence of the statement made by appellant.

The judgment is affirmed.

Brown (Gerald), P. J., and Coughlin, J., concurred.