[Crim. No. 8899. Second Dist., Div. Two. Mar. 2, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. RONALD MAYFIELD et al., Defendants and Appellants.

Erling J. Hovden, Public Defender, under appointment by the District Court of Appeal, Richard W. Erskine and James L. McCormick, Deputy Public Defenders, for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

ROTH, J.—Appellants were convicted of second degree murder.

The relevant evidence gathered primarily from the testimony of police officers to whom confessions were made and from the appellants who took the stand, reveals the following:

During the early morning hours of June 10, 1962, Ronald Mayfield and Charles Brown, appellants, together with one Sammy Dennis, met at a bar in Los Angeles, California. In a conversation which ensued the three men decided to pool their funds and purchase a supply of narcotics (heroin) for their own use from an individual known to Brown. The three men in search of the source of supply proceeded to the corner of Adams and Normandie Streets in Los Angeles, where they met the deceased, Willie Ricard. Ricard was also interested in the purchase of narcotics and offered to chip in his pro rata.

The record shows that two balloons containing heroin were purchased at $10 apiece from one Billy Reid at or about the place where the three men met Ricard, but it is uncertain as to who made the purchase. After the heroin had been obtained, the four men proceeded in Ricard's car to Brown's apartment. Each balloon was divided for use between two men. The contents of the first balloon were divided between the deceased and Mayfield. The contents of the second balloon were then divided between Sammy Dennis and Appellant Brown. The deceased applied his own tourniquet and injected the heroin compound into himself. Appellant Mayfield said the deceased tied and fixed himself and Brown confirmed the fact that each of the four men had injected himself with heroin. Mayfield wasn't sure who supplied the kit. Brown testified he furnished the spoon. Brown also supplied a necktie (used as a tourniquet) but it was only for

himself, Dennis and Mayfield. The deceased used his own handkerchief. Brown, too, did not know who supplied the kit. According to Appellant Mayfield, after the deceased injected himself, there was an argument over money. Brown testified he had chipped in $2.00. Brown didn't have the $5.00 he had promised to contribute. The deceased had contributed his $5.00. There was a discussion as to the balance.

Almost immediately after Ricard had injected the heroin into his veins, he walked slowly out of the room and disappeared from view. A few minutes later Mayfield noticed Ricard's absence and looked into the bathroom, where he found Ricard lying unconscious on the floor. Attempts were made to revive Ricard by shaking him and applying cold towels to his face, but to no avail. Some thought was given to placing Ricard in a cold bath, but Dennis noticed that Ricard's heart and pulse had ceased beating. Further attempts to revive Ricard were abandoned. Appellant Mayfield and Sammy Dennis then left the premises.

When Mayfield and Dennis left, Brown pulled Ricard to the couch, covered him with a blanket, and went to look for help. He located his brother at a hot dog stand and both men returned to Brown's house. Ricard was carried to his car and driven to the corner of 24th and Normandie Streets, where he was left lying in the back seat of the car. Brown testified that he thought that Ricard might revive by exposure to the fresh air and that he wasn't aware of the fact that Ricard was dying or already dead.

Appellant Brown had a girl friend call the police and advise them where Ricard's body was. She did, but didn't indicate that Brown in any way was connected to the body. Brown was subsequently arrested due to information furnished by an informer. Mayfield departed for his home in Bakersfield on the morning in which the above events took place.

Respondent's position that appellants are properly convicted of murder in the second degree is predicated upon the cases of *People* v. *Poindexter,* 51 Cal.2d 142 [330 P.2d 763] and *Ureta* v. *Superior Court,* 199 Cal.App.2d 672 [18 Cal. Rptr. 873]. These cases hold, says respondent, that since appellants violated that portion of section 11501 of the Health and Safety Code of the State of California which prohibits the administering of narcotics, which is a felony, and since this felony resulted in the death of a human being, appellants are guilty of murder. The pertinent portion of section

11501 is as follows: "Except as otherwise provided in this division, every person who transports, imports into this State, sells, furnishes, administers or gives away, or offers to transport, import into this State, sell, furnish, administer, or give away, ... except upon the written prescription of a physician, ... shall be punished by imprisonment ... in the state prison from five years to life."

Appellants assert that the evidence reflects no more than a violation of section 11721 of the Health and Safety Code of the State of California. The pertinent first sentence of that section reads: "No person shall use, or be under the influence of, or be addicted to the use of narcotics, excepting when administered by or under the direction of a person licensed by the State to prescribe and administer narcotics ... Any person convicted of violating any provision of this section is guilty of a misdemeanor and shall be sentenced to serve a term of not less than 90 days nor more than one year in the county jail . . . ."

In the trial court the deputy district attorney stated his theory of the case substantially as follows: "I will state very frankly at this time that our object will be to prove, in a manner that I just outlined a few moments ago . . . this deceased came to an unlawful death by virtue of an injection of a poison; ... that the evidence will show that the two accuseds provided, feloniously, and in violation of section 11501, the deceased with this product and then aided him actually in connection with the delivery to inject that poison and that substance into his body, and that that is the thing that led to his death."

"THE COURT: And that, under the *Poindexter* case, would be murder second."

It is highly debatable whether there is any evidence which proves or tends to prove—to say nothing about proof beyond a reasonable doubt—that appellants or either of them sold to or injected heroin into deceased.

Respondent says: "The fact that the deceased alone injected himself with heroin, and that fact rests on appellants' credibility, would not necessarily exonerate appellants from aiding and abetting in the commission of the offense and thus being principals. *People* v. *Hopkins,* 101 Cal.App.2d 704, 706-707 [226 P.2d 74]; Penal Code section 31. Clearly, appellants did aid and abet. They chipped in to purchase the deadly contraband. There was evidence that Appellant Brown contributed a spoon. It could have been concluded that this was a group project where the participation of each man was

an incitement and encouragement to the others to complete the unlawful design."

Predicated upon the two cases *Poindexter* and *Ureta, supra,* and the argument quoted, respondent urges the application of the felony-murder doctrine.

We are not convinced however that section 11501 was violated or that a felony was committed.

Appellants did not sell narcotics to anyone or to each other. The four men involved made a group purchase of narcotics for their individual use and the purpose of the purchase was carried out.

No cases have been cited to us which clearly define what "administer" of narcotics means as that word is used in section 11501.

On the record before us, if after the purchase all four of the men involved had proceeded to separate apartments and separately injected themselves, but before going their separate ways Brown had loaned one or more of them a necktie to use for a tourniquet, or a spoon, or a package of matches or a kit, Brown, if respondent's position is sound, would be guilty of a felony (violation of § 11501) because he aided and abetted in administering the drug to one or more of his copurchasers with the loan of one or more of the props necessary to complete an injection. The copurchasers however would be guilty only of a misdemeanor, to wit: use of the drugs, a violation of section 11721. On the same hypothesis, if three of the four had died in the same manner as did Ricard, Brown as the sole survivor who aided and abetted with the loan of props would be guilty of three murders.

It seems to us that the crime of murder which was here charged is an exaggeration and distortion of the facts, and that the facts of this case do not come within the meaning of the word "administer" as used in section 11501. Neither do the facts of this case parallel those in either one of the cases upon which respondent relies.

In the *Poindexter* case, the pusher, Poindexter, sold the drug and helped physically to administer it to a minor who died.

*Ureta (supra)* was a proceeding whereby Ureta as petitioner sought to restrain the superior court by way of prohibition from proceeding with the trial of a murder case on the ground that there was no corpus delicti established.

In *Ureta,* it was established that "... he [Ureta] first met deceased in Chinatown, where deceased was looking for nar-

cotics. Eventually he and deceased purchased four small tablets containing a quarter grain of morphine. Petitioner [Ureta] then shot three of these into deceased's arm and one into his own. Later in the day they purchased two more tablets of a narcotic which petitioner thought was morphine.'' (*Ureta, supra,* at p. 674.)

In respect of the establishment of a corpus delicti which was the only question decided, the court says at page 675: ''The evidence here, disregarding the extrajudicial acts and statements of petitioner, shows that deceased was found dead in petitioner's room, with a puncture wound on the inside of his right arm below the elbow. The death was caused by morphine poisoning.

''Does this raise a reasonable inference that the death may have been caused by a criminal agency? To determine this question it is necessary to point out that the *furnishing,* selling or *administering* of narcotics to another is a felony. . . . 'Death resulting from the commission of a felony such as furnishing, selling or administering of narcotics ... constitutes murder of the second degree.' (*People* v. *Poindexter,* 51 Cal.2d 142 [330 P.2d 763].)''

We agree with the contention of appellants that the evidence does not prove a violation of section 11501 of the Health and Safety Code or the commission of a felony.

There being no appeal from the orders denying motions for new trial, said appeals are dismissed.

The judgments are reversed.

Fox, P. J., and Herndon, J., concurred.

A petition for a rehearing was denied March 26, 1964, and respondent's petition for a hearing by the Supreme Court was denied April 29, 1964. Gibson, C. J., and Schauer, J., were of the opinion that the petition should be granted.