[Crim. No. 23821. July 25, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DENNIS WILLIAM EDWARDS, Defendant and Appellant.

**COUNSEL**

Richard Power, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, John W. Carney and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

Michael D. Bradbury, District Attorney (Ventura), Vincent J. O'Neill, Jr., Chief Assistant Deputy District Attorney, and Marcia C. Levine, Deputy District Attorney, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

**GRODIN, J.**—Defendant Dennis William Edwards appeals from convictions of furnishing and/or administering heroin (Health & Saf. Code, § 11352) and second degree murder (Pen. Code, § 187) following the accidental and fatal heroin overdose of his girlfriend, Victoria Rogers. At the close of trial, defendant requested that the jury be instructed on involuntary manslaughter. The trial court, believing there was insufficient evidence to support a conviction of involuntary manslaughter, refused to give the requested instruction. As a result, the jury was compelled either to acquit defendant outright or convict him of furnishing and/or administering heroin and second degree murder.

We conclude there was substantial evidence from which the jury could properly have found defendant guilty of involuntary manslaughter and that the trial court therefore erred in refusing to give the requested instruction. We further conclude that the trial court erred in failing to instruct the jury that defendant could not be convicted of furnishing heroin to Rogers if he and Rogers were merely copurchasers of the heroin. As we shall explain, although the trial court's failure to properly instruct the jury requires that both of defendant's convictions be reversed, the People shall have the option of accepting a modification of the judgment to reflect a conviction of involuntary manslaughter and unlawful heroin use.

Defendant and his girlfriend, Victoria Rogers (the deceased), went to San Bernardino to find work. Rogers had recently been fired from her job in another city and defendant had been unemployed for some time. Before coming to San Bernardino, Rogers had sold her car and, with the proceeds, she and defendant planned to rent an apartment in San Bernardino and purchase a cheaper car. Defendant apparently had possession of all of the couple's money.

On October 27, 1982, defendant and Rogers were hitchhiking on their way to look at an apartment for rent when they were picked up by Burt Royce and his girlfriend, Lula Nava. Royce and Nava agreed to take de-

fendant and Rogers to view the apartment. On the way to the apartment, the four stopped at a gas station. According to Nava's testimony, while Royce was outside the car pumping gas, defendant mentioned something about hard drugs and stated that he had used heroin before. Nava testified that she asked defendant not to talk about heroin in front of Royce because Royce, who had previously used heroin, was "cooling down" and had not used heroin for about two months. When Royce returned to the car, the four went to look at the apartment for rent and then drove to the apartment shared by Royce and Nava.

After drinking beer and smoking marijuana at the couple's apartment, Royce, Rogers and defendant drove to look at a used car which defendant and Rogers were interested in purchasing. Nava, who was ill, remained at the apartment.

What followed next is taken from the tape-recorded statement defendant gave to police the day after his arrest. After looking at the used automobile and making arrangements to have it delivered that evening, Royce, Rogers and defendant visited two bars where the two men drank beer and Rogers drank rum and cokes "one after the other." According to defendant's statement, while at the second bar Royce began talking about heroin and told defendant and Rogers that he could get some "real good black stuff." Defendant and Rogers told Royce that neither of them had ever tried heroin before but, after some discussion, they agreed to "get some."

The three then left the bar, picked up another woman, Isotta Mullican, and drove to a motel to purchase the heroin. Defendant gave $50 to Mullican who apparently left the car, purchased two balloons of heroin and returned to the car. The four then drove to Mullican's house where they all congregated in the bathroom as Mullican prepared the heroin. Mullican supplied the syringe used for the injection and the spoon and cigarette lighter used to "cook" the heroin. After Royce and Mullican had each injected themselves with one-half balloon, Mullican injected Rogers and then defendant with a half-balloon each. Rogers and defendant each "tied-off" their own arms to facilitate injection.

After defendant was injected, he noticed that Rogers was slipping off the toilet seat on which she had been sitting. Defendant asked Rogers if she was all right but received no response. Upon examination, defendant was unable to detect any sign of breathing or pulse. He placed Rogers in the shower and turned on the cold water but Rogers did not respond. Royce then began giving Rogers mouth-to-mouth resuscitation, but to no avail. Eventually, Royce and defendant dragged Rogers out of the house, put her into Royce's car and drove to a nearby market.

Defendant and Royce entered the market, purchased a can of beer and left. Thirty seconds later they returned and told the store clerk that she should call for paramedics because they had found a girl lying either dead or seriously ill in the dumpster outside the market. After calling the paramedics, the clerk went outside and observed Rogers, apparently unconscious, lying on the pavement beneath the passenger door of Royce's car. The clerk then observed Royce and defendant carrying Rogers closer to the door of the market.

The paramedics soon arrived and, suspecting a heroin overdose, began treating Rogers accordingly. When the police arrived they questioned Royce and defendant. Defendant gave the police a false name and told them that he and Royce had found the woman (Rogers) unconscious outside the market. The police did not believe defendant and suspected that both he and Royce were under the influence of narcotics. Defendant and Royce were arrested.

The following day, in a taped interview, defendant admitted his involvement to the police, and led them to Mullican's house where the police found two empty balloons and a spoon in the bathroom. Rogers had suffered irreversible brain damage and died a week later without ever regaining consciousness. The cause of death was heroin overdose.

Defendant was charged with furnishing and/or administering a controlled substance in violation of Health and Safety Code section 11352,[1] and with second degree murder under Penal Code section 187 based on the second degree felony-murder rule. Following a jury trial, defendant was convicted on both counts and sentenced to concurrent terms of four years for the furnishing and/or administering, and fifteen years to life for murder.[2]

## I.

At the close of trial, defendant requested that the jury be instructed on the offense of involuntary manslaughter. The trial court refused to give the requested instruction, believing there was insufficient evidence to sup-

---

[1]Section 11352 provides, in part: "[E]very person who transports, imports into this state, sells, furnishes, administers, or gives away . . . any controlled substance specified in subdivision . . . (c) . . . of section 11054 . . . shall be punished by imprisonment in the state prison for three, four, or five years."
"Furnish," as used in Health and Safety Code section 11352, means "to supply by any means, by sale or otherwise." (Health & Saf. Code, § 11016; Bus. & Prof. Code, § 4048.5.)

[2]Royce and Mullican each pleaded guilty to furnishing heroin and involuntary manslaughter, "with the understanding that it be referred to Probation." However, neither Royce nor Mullican testified at defendant's trial.

port a conviction of that offense. Defendant contends the jury could have found his conduct fell short of furnishing heroin to Rogers and, instead, constituted only aiding and abetting Rogers in her use of heroin—a misdemeanor. (Health & Saf. Code, § 11550.) Therefore, defendant argues, the jury could properly have found him guilty of involuntary manslaughter based on a misdemeanor-manslaughter theory (Pen. Code, § 192, subd. (b)), and instructions on that offense should have been given.[3]

Defendant relies heavily on *People* v. *Mayfield* (1964) 225 Cal.App.2d 263 [37 Cal.Rptr. 340], for his contention that the jury could properly have found he did not furnish the heroin to Rogers but, rather, was guilty only of aiding and abetting Rogers' use of heroin. In *Mayfield*, the three defendants, during a conversation in a bar, decided to pool their funds and purchase a supply of heroin for their own use. All three men went together in search of the source and, along the way, met the deceased, Willie Ricard, who was also interested in purchasing heroin and who offered to chip in his pro rata share. Although it was unclear who actually made the purchase, two balloons of heroin were acquired and the four returned to one of their apartments where each injected himself with a half a balloon. Ricard died shortly thereafter of a heroin overdose and the defendants were convicted of violating Health and Safety Code section 11501 (the predecessor to § 11352) and of second degree murder.

The prosecution's theory at trial had been that the defendants " 'provided, feloniously, and in violation of section 11501, the deceased with [the heroin] and then aided him actually in connection with the delivery to inject that poison and substance into his body. . . .' " (225 Cal.App.2d at p. 266.) The Court of Appeal reversed the defendant's conviction stating, "We are not convinced however that section 11501 was violated or that a felony was committed. [¶] Appellants did not sell narcotics to anyone or to each other. The four men involved made a *group purchase* of narcotics for their *individual use* and the purpose of the purchase was carried out." (*Id.*, at p. 267, italics added.)[4]

■ The distinction drawn by the *Mayfield* court between one who sells or furnishes heroin and one who simply participates in a group purchase

---

[3]Defendant challenges his convictions on a number of other grounds including improper instructions on aiding and abetting and the inapplicability of the second degree felony-murder rule to the facts of this case. Because we conclude that reversal of both convictions is required based on the trial court's failure to properly instruct the jury on involuntary manslaughter and furnishing, we do not address defendant's other challenges.

[4]Although the court in *Mayfield* expressly stated that the defendant had not sold or administered the heroin, the court implicitly held that the defendants were not guilty of furnishing, either. (*People* v. *Taylor* (1980) 112 Cal.App.3d 348, 358 [169 Cal.Rptr. 290]; *People* v. *Cline* (1969) 270 Cal.App.2d 328, 332 [75 Cal.Rptr. 459, 32 A.L.R.3d 582].)

seems to us a valid one, at least where the individuals involved are truly "equal partners" in the purchase and the purchase is made strictly for each individual's personal use. Under such circumstances, it cannot reasonably be said that each individual has "supplied" heroin to the others.[5] ▇ We agree with defendant that there was substantial evidence from which the jury could reasonably have concluded that he and Rogers were equal partners in both the financing and execution of the heroin purchase.[6]

In his tape-recorded statement to police, defendant stated that he and Rogers had gotten some money together by selling Rogers' car, that he carried all of the couple's money, and that the two of them planned to use the money to buy a new car and rent an apartment. From this evidence the jury could have inferred that, although defendant gave Mullican the $50 to purchase the heroin, the money came from "pooled" or "joint" funds belonging to both defendant and Rogers. The jury could reasonably have concluded, therefore, that defendant and Rogers were equal partners in financing the purchase.

Even if defendant and Rogers were equal partners in financing the heroin purchase, the jury could nonetheless have found defendant guilty of furnishing heroin to Rogers if it concluded that defendant instigated the purchase and was actively involved in arranging and consummating the deal, while Rogers was wholly passive and merely accepted the heroin when it was obtained and offered to her.[7] However, there was substantial evidence from which the jury could have concluded that defendant did not instigate the purchase and that he and Rogers were equal partners in the decision to make the purchase and in its consummation, as well.

In his tape-recorded statement to police, defendant stated that it was Royce who first suggested the heroin purchase to defendant and Rogers. Royce was an admitted heroin user who, although himself penniless, knew

---

[5]We expect there will be few cases involving a copurchase by truly equal partners. Where one of the copurchasers takes a more active role in instigating, financing, arranging or carrying-out the drug transaction, the "partnership" is not an equal one and the more active "partner" may be guilty of furnishing to the less active one. Furthermore, one who acts as a go-between or agent of either the buyer or seller clearly may be found guilty of furnishing as an aider and abettor to the seller. (See, e.g., *People* v. *Richards* (1961) 198 Cal.App.2d 465, 469-471 [17 Cal.Rptr. 845]; *People* v. *Hutcherson* (1961) 197 Cal.App.2d 771, 779-780 [17 Cal.Rptr. 636], cert. den. *Hutcherson* v. *California* (1962) 371 U.S. 872 [9 L.Ed.2d 109, 83 S.Ct. 139].) However, because one who merely purchases drugs is not guilty of furnishing as an aider and abettor of the seller (*People* v. *Label* (1974) 43 Cal.App.3d 766, 770 [119 Cal.Rptr. 522]), an equal partner in a copurchase cannot be found guilty of furnishing to his copurchaser on a theory that he aided and abetted the actual seller.

[6]It is undisputed that, as between defendant and Rogers, the heroin was purchased for each one's personal use.

[7]See, *ante,* footnote 5.

defendant was carrying a substantial amount of money. The jury could reasonably have concluded that Royce, rather than defendant, instigated the purchase.

Although defendant did not expressly state that he and Rogers jointly agreed to buy the heroin, his comments to the police suggest that it was a mutual decision. For instance, defendant stated that as he and Rogers left the bar with Royce, Royce "started talking to us about heroin, you know, and, and, ah, we said well we've never tried it before, you know, and he started running it down to us and telling us about this real good black stuff that he could get . . . . So, ah, then Vicky [Rogers] and I finally conceded [*sic*] that, yeah, you know, we'll get some . . . ."

Both defendant's statement that Royce suggested the purchase and the inference that defendant and Rogers jointly decided to make the purchase, are further supported by evidence that Rogers and defendant were equally inexperienced with heroin. Defendant told both Royce and the police that neither he nor Rogers had ever used heroin before. The forensic pathologist who performed the autopsy on Rogers testified that he found no evidence of chronic intravenous drug abuse. Similarly, a police detective who carefully examined defendant's arm with a magnifying glass testified that he could find only one needle mark, apparently the one defendant had acquired the preceding day in Mullican's bathroom.

Finally, there is substantial evidence to suggest that defendant and Rogers were equally active in the consummation of the purchase. There was evidence that both agreed to buy the heroin, both accompanied Royce and Mullican to the site where Mullican purchased the heroin from a source unknown to either defendant or Rogers, and both went into Mullican's bathroom where each received an injection of heroin. Neither one acted as a go-between or agent of the other. The jury could properly have found that the only difference between defendant's conduct and that of Rogers was that defendant actually handed the $50 to Mullican. In light of the evidence that the $50 belonged to both defendant and Rogers, this act, alone, would not constitute furnishing.

Although the evidence is far from overwhelming, we conclude there was substantial evidence that Royce suggested the heroin purchase, that defendant paid for the heroin with joint funds and that defendant and Rogers were "equal partners" both in the decision to make the purchase and in its consummation.[8] Had the jury believed this evidence, it could properly have

---

[8]Although we conclude there was substantial evidence to support a finding that defendant and Rogers were "equal partners" in the purchase, we note that, contrary to defendant's contention, there was also substantial evidence from which the jury could have concluded that defendant and Rogers were not truly equal partners and, therefore, that defendant was guilty of furnishing the heroin to Rogers.

found defendant guilty only of aiding and abetting Rogers in her own use of heroin and, consequently, could have found defendant guilty of involuntary manslaughter.

Defense counsel requested an instruction on involuntary manslaughter.[9] This request was denied. ■ "[I]t is reversible error to refuse a manslaughter instruction in a case where murder is charged, and the evidence would warrant a conviction of manslaughter." (*People* v. *Carmen* (1951) 36 Cal.2d 768, 773-774 [228 P.2d 281]; *People* v. *Gaulden* (1974) 36 Cal.App.3d 942, 951 [111 Cal.Rptr. 803].) ■ As we have explained, there was sufficient evidence to support a conviction of manslaughter in this case. It was therefore reversible error for the trial court to refuse the requested instruction.[10] Because the factual question posed by the omitted

---

[9]Although defense counsel was unable to articulate a specific theory to support his request, ample support was provided by two cases brought to the trial court's attention during argument on the requested instruction. The first case was *People* v. *Mayfield, supra,* 225 Cal.App.2d 263. As already discussed, *Mayfield* suggests that if defendant and Rogers were copurchasers of the heroin, defendant would not be guilty of furnishing and, therefore, could not be guilty of second degree felony murder.

The second case to which the trial court was alerted was *People* v. *Wong* (1973) 35 Cal.App.3d 812 [111 Cal.Rptr. 314]. In *Wong,* the defendants were charged with furnishing heroin to a minor, a felony, and murder in connection with the fatal heroin overdose of a minor girl. The jury convicted the defendants of contributing to the delinquency of a minor, a misdemeanor, and involuntary manslaughter. Significantly, the trial court in *Wong* had instructed the jury that if the defendants *aided and abetted the victim in her use of heroin,* they would be guilty of contributing to the delinquency of a minor and, consequently, would be guilty of involuntary manslaughter. (*Id.,* at p. 835, fn. 2.) The Court of Appeal opinion in *Wong* refers, at least three different times, to the fact that the defendants' convictions could properly have been predicated on a finding that they aided and abetted the victim in her use of heroin. (*Id.,* at pp. 832, 835-836.)

In light of the fact that the trial court was alerted to the holdings in *Mayfield* and *Wong* and indicated that it had read both cases, defendant's failure to articulate a specific theory to support his request for an instruction on involuntary manslaughter is not controlling. We note that the trial court made a conscientious effort to determine whether there was any basis for giving the requested instruction and we do not fault the court for failing to recognize in the midst of trial what, in hindsight, seems to be the clear significance of the holdings in *Mayfield* and *Wong.* Nonetheless, under the facts of this case, defendant was entitled to an instruction on involuntary manslaughter and the trial court was presented with both sufficient evidence and sufficient authority to support defendant's request.

[10]Even in the absence of a request, the trial court has a duty to instruct *sua sponte* on offenses necessarily included in the charged offense if there is sufficient evidence to support a conviction of the lesser included offense. (*People* v. *Wickersham* (1982) 32 Cal.3d 307, 323-325 [185 Cal.Rptr. 436, 650 P.2d 311].) Although, ordinarily, involuntary manslaughter is a lesser included offense of murder (*In re McCartney* (1966) 64 Cal.2d 830, 831 [51 Cal.Rptr. 894, 415 P.2d 782]; *People* v. *Wong, supra,* 35 Cal.App.3d 812, 820, fn. 1, 830; 17 Cal.Jur.3d (Rev), Criminal Law, § 199, p. 311), it could be argued that involuntary manslaughter based on a misdemeanor-manslaughter theory is not a lesser included offense of second degree felony murder where, as here, the underlying misdemeanor is not a lesser included offense of the charged felony. Under such circumstances, it might be argued, a *sua sponte* instruction on involuntary manslaughter would violate the defendant's due process right to notice of the charges against him. (*People* v. *Lohbauer* (1981) 29 Cal.3d 364, 368 [173 Cal.Rptr. 453, 627 P.2d 183].) However, because defendant here specifically requested

instruction was not necessarily resolved adversely to defendant under other, properly given instructions, the error was not harmless and the conviction must be reversed. (*People* v. *Geiger* (1984) 35 Cal.3d 510, 532 [199 Cal.Rptr. 45, 674 P.2d 1303]; *People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913].)

## II.

██ Defendant's conviction of furnishing and/or administering heroin must also be reversed. ██ Although defendant did not specifically request an instruction that he could not be convicted of furnishing if he and Rogers were copurchasers, " '[i]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' (*People* v. *St. Martin* (1970) 1 Cal.3d 524, 531 [83 Cal.Rptr. 166, 463 P.2d 390])." (*People* v. *Sedeno, supra,* 10 Cal.3d at p. 715.) ██ As should be apparent from what has already been said, the holding in *Mayfield,* that mere copurchasers are not guilty of furnishing to one another, is a principle closely and openly connected with the facts of this case and one necessary for the jury's understanding of the case. Under these circumstances, the trial court erred in failing to instruct the jury that defendant was not guilty of furnishing if he and Rogers were copurchasers.

There was sufficient evidence to support a conviction of furnishing and/or administering based on a theory that defendant furnished the heroin to Royce and Mullican or that defendant aided and abetted Mullican in administering the heroin to Rogers. A conviction based on either of these theories would not be affected by the trial court's instructional error. However, because we cannot determine on this record whether the jury verdict was based on one of these theories or on a theory that defendant furnished the heroin to Rogers, the judgment must be reversed. (See *People* v. *Green* (1980) 27 Cal.3d 1, 69-71 [164 Cal.Rptr. 1, 609 P.2d 468].)[11]

---

an instruction on involuntary manslaughter, we need not and do not decide whether in the absence of such a request, the trial court would have had a duty to give the instruction *sua sponte.*

[11]It is most likely that the jury verdict was based on a theory that defendant furnished the heroin to Rogers. The prosecution's theory of the case was that defendant was guilty of murder based on the second degree felony-murder rule. Attention was therefore necessarily focused on defendant's conduct vis-à-vis Rogers. Neither Royce nor Mullican testified, and the prosecution never argued to the jury that defendant had furnished Royce and Mullican with heroin. Furthermore, although the prosecution did suggest in its closing argument that defendant could be guilty of aiding and abetting Mullican in administering the heroin to Rogers, both the evidence and the prosecution's argument clearly focused on the furnishing allegation.

III.

Although defendant's convictions cannot stand, it does not necessarily follow that the judgment must be unconditionally reversed. ▮ "An appellate court is not restricted to the remedies of affirming or reversing a judgment. Where the prejudicial error goes only to the degree of the offense for which the defendant was convicted, the appellate court may reduce the conviction to a lesser degree and affirm the judgment as modified, thereby obviating the necessity for a retrial. (See Pen. Code, § 1260; *People* v. *Harris* (1968) 266 Cal.App.2d 426, 434-435 [72 Cal.Rptr. 423].)" (*People* v. *Alexander* (1983) 140 Cal.App.3d 647, 666 [189 Cal.Rptr. 906].)

Defendant requested an instruction on involuntary manslaughter and the record establishes his guilt of that offense as a matter of law. Moreover, during oral argument defense counsel stated that defendant was not asking to be "let off" but only that his conviction be reduced to involuntary manslaughter.[12]

However, although defendant has thus consented to modification of the judgment, the People have expressed no view on the matter. (Cf. *People* v. *Bailey* (1974) 38 Cal.App.3d 693, 700 [113 Cal.Rptr. 514].) Because, notwithstanding the trial court's instructional errors there was sufficient evidence to support convictions of furnishing and second degree murder, the People are entitled to retry defendant on these charges, should they so choose. On the other hand, the People may well be satisfied with obtaining convictions of involuntary manslaughter and unlawful heroin use. Because we do not know which option the People would prefer, our disposition should preserve both options. (*People* v. *Garcia* (1972) 27 Cal.App.3d 639, 648 [104 Cal.Rptr. 69].)

The judgment is reversed with directions as follows: If the People do not bring defendant to trial within 60 days after the filing of the remittitur in the trial court pursuant to Penal Code section 1382, subdivision 2, the trial court shall proceed as if the remittitur constituted a modification of the judgment to reflect a conviction of involuntary manslaughter (Pen. Code, § 192) and unlawful use of heroin (Health & Saf. Code, § 11550) and shall resentence defendant accordingly.

Mosk, J., Kaus, J., Broussard, J., Reynoso, J., and Lucas, J., concurred.

---

[12]Because defendant concedes that he aided and abetted Rogers' use of heroin and because this is the only basis suggested by defendant to support a conviction of involuntary manslaughter, we treat his consent to an involuntary manslaughter conviction as including consent to a conviction of unlawful use of heroin.

BIRD, C. J.—I concur in the reversal of appellant's convictions of furnishing and/or administering heroin and second degree murder. However, I would reverse the latter for the reasons set forth in my concurring opinion in *People* v. *Burroughs* (1984) 35 Cal.3d 824, 836-854 [201 Cal.Rptr. 319, 678 P.2d 894].